# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS

TYRONE D. DEJOIE, JR. ET AL                 NO. 22-00050-BAJ-EWD

## RULING AND ORDER

Now before the Court are Defendants Tyrone D. Dejoie Jr. and Quwinton Normans' **Motions to Suppress (Docs. 73, 82)**. Norman seeks to suppress evidence seized from 25865 Oakley Avenue, Denham Springs, Louisiana, pursuant to a search warrant. He specifically challenges the sufficiency of the affidavit in support of the warrant. Dejoie challenges evidence seized from his vehicle pursuant to a search warrant and inculpatory statements made following his arrest. Both Motions are opposed. (Docs. 87, 88). A hearing on the Motions was held on January 24, 2024. (*See* Doc. 114). Following the hearing, the parties submitted supplemental briefing. (Docs. 124, 125, 129, 130). For reasons that follow, Norman's Motion will be granted, and Dejoie's Motion will be denied.

## I.    BACKGROUND

In the latter half of 2021, based on information received from multiple reliable Confidential Informants (CIs), Narcotics Agents with the Livingston Parish Sheriff's Office began investigating a suspected methamphetamine dealer, Fleet H. Wallace. (Doc. 122, January 24, 2024 Motion Hearing Transcript, *hereinafter* "Tr.," at 23). In

early December 2021, one of the CIs contacted Agent Jeff Scroggins and reported that Wallace was receiving large amounts of methamphetamine from an unknown black male who resided at 25573 Highway 16, Apt A, Denham Springs, Louisiana (*hereinafter* "Hwy. 16 Address") and drove a black Chevrolet Tahoe. (Doc. 82-2 at 3). The CI had seen "a large quantity of methamphetamine" at the Hwy. 16 Address. (*Id*). Agents began investigating and surveilling the address and learned that an individual listed as living there, Defendant Norman, was on parole with the Louisiana Probation and Parole Office and had a history of narcotics distribution offenses. (Tr. at 23).

On December 30, 2021, an investigator with the U.S. Department of Homeland Security informed Agent Scroggins about a UPS package containing 20 pounds of suspected methamphetamine seized in Louisville, Kentucky, and addressed to an "Alex Donovan" at the apartment next door to the Hwy. 16 Address. (*Id.* at 26). The Agents were unable to find a person with that name living anywhere in the parish, and Agent Scroggins testified that sending illicit substances to an invented individual at a nearby address is a common tactic used by drug dealers to avoid detection. (*Id.* at 26).

Agents began to surveil Norman and his residence. On January 7, 2022, Wallace was observed speaking to Norman at the Hwy. 16 Address. (*Id.* at 31). On January 10, Wallace returned to the address, sat for a time in Norman's vehicle, and then returned to his vehicle holding a small package. (*Id.* at 33). Agents suspected that a narcotics transaction had occurred and followed both suspects. (*Id.* at 34).

Norman drove to 25865 Oakley Avenue, Denham Springs, Louisiana, (*hereinafter* "Oakley Address"), and spent the night there, (Doc. 83-2 at 4), and Wallace drove to a nearby Home Depot. (Tr. at 33–34).

At the Home Depot, Agent Scroggins and another officer found Wallace seated in his vehicle with a bag of suspected methamphetamine "in plain view." (*Id.* at 34). Wallace was arrested and questioned, and he admitted to having purchased the drugs 20 minutes earlier from Norman. (*Id.* at 35). Agents obtained search warrants for Wallace's phones and discovered numerous text messages describing repeated drug transactions with an individual named "Que," which Agents suspected referred to Norman. (*Id.* at 36). In those messages, Wallace describes to meetings with Norman at his residence and nearby locations. (*Id.* at 36). In one message with another individual named "BQ," which Agents suspected was an alias for Norman, BQ says he will meet Wallace in a silver 2019 Nissan Altima, another car the Agents had observed Norman driving. (Doc. 83-2 at 4).

Meanwhile, the Agents continued their surveillance of Norman. On January 11, Norman was observed driving two times from the Oakley Address to the Hwy. 16 Address. (Doc. 73-2 at 17). Late on January 12, Agent Scroggins electronically submitted an affidavit in support of a request for a search warrant for the Oakley Address. (Tr. at 63). The warrant was issued early in the morning of January 13. (*Id.*).

Around midday on January 13, Norman arrived at the Hwy. 16 Address. (*Id.* at 43). Agent Scroggins watched the scene from behind a fence adjoining the parking lot. (*Id.* at 70–71). He saw Norman meet with a man driving a tan Chevrolet pickup

truck. (*Id.* at 43). Suddenly, while the other man stayed put, Norman left, and other Agents followed him as he drove to the Oakley Address, waited a few moments, and returned to the Hwy. 16 Address. (*Id.*). Agent Scroggins described this as an evasive maneuver, intended to lose pursuing law enforcement. (*See id.* at 58). Moments after returning, Norman was seen handing Dejoie a gray Walmart bag in exchange for a black duffle bag. (*Id.* at 44). Norman placed the black duffel bag inside of his vehicle and drove to the Oakley Address, and Dejoie drove to a nearby Walmart. (*Id.* at 40, 47). Agents believed they had observed a narcotics transaction. (*Id.* at 47).

When Dejoie entered the Walmart, Sergeant Carl Childers approached Dejoie's vehicle. (*Id.* at 114). In testimony, Sergeant Childers described what happened next. As he was passing the driver's side window, he saw the gray Walmart bag resting behind the center console. (*Id.*).[1]

While Dejoie remained in the Walmart, Sergeant Childers was alerted over the radio that Norman had been arrested at the Oakley Address, where they found him in possession of the black duffle bag that was previously exchanged with Dejoie. (*Id.* at 116). The bag was confirmed to have methamphetamine inside. (*Id.*). When Dejoie exited the Walmart, he was arrested. (*Id.*). Sergeant Childers advised Dejoie of his

---

[1] In testimony and in his affidavit in support of the warrant to search Dejoie's truck, Sergeant Childers said the bag appeared to have a $20 bill inside, pressed up and visible against the plastic. (*Id.*) Sergeant Childers further testified that "he could tell [by] the shape of the bag [that] there [were] more stacks of currency inside [the bag]." (*Id.*). Although the parties vigorously dispute whether any money was visible in the bag from outside the truck, (*see* Docs. 129, 130), and photographs from the scene presented at the motion hearing as evidence certainly called into question whether the money was indeed visible, (*see* Tr. at 151–152), for the reasons stated below, probable cause to search the truck existed independent of the visibility of the money, *see infra* Section III.B.

*Miranda* rights, and Dejoie acknowledged that he understood them. (*Id.* at 117). Dejoie then made inculpatory statements. (*Id.*). Sergeant Childers applied for a warrant, a warrant was issued, and Sergeant Childers searched Dejoie's truck. (*Id.* at 118). Agents found suspected drugs and $34,000 in cash in the Walmart bag. (*Id.* at 120).

While events played out at the Walmart, Norman was followed to the Oakley Address. Agent Scroggins radioed Officer Keaston Evitt, a Criminal Patrol Uniform Deputy, to "intercept Norman and conduct a traffic stop." (*Id.* at 46). As Norman was "pulling into the garage" at the Oakley Address, Officer Evitt arrived and pulled in behind Norman. (*Id.* at 47.). After getting out of his vehicle in the garage, Norman appeared to attempt to smash his cell phone, and Officer Evitt took him into custody. (*Id.*).

Pursuant to the search warrant obtained by Agent Scroggins, the Agents conducted a search of the house and Norman's vehicle, which was inside the garage connected to the house. (*Id.*). In the black duffel bag given to Norman by Dejoie, Agents found a "substantial amount of methamphetamine." (*Id.*). From the search of the vehicle and residence, Agents seized large amounts of drugs, $64,109.00 in cash, and numerous additional incriminating items. (*Id.* at 120).

## II.    PROCEDURAL HISTORY

Defendants were indicted on July 14, 2022, and charged with knowingly and intentionally possessing 500 grams or more of methamphetamine with the intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). Norman was

additionally charged with possession with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). (Doc. 1 at 1-2). In early 2023, Norman and Dejoie filed Motions to Suppress Evidence (Docs. 73, 82). The Government opposes both Motions. (Docs. 87, 88). On January 24, 2024, a hearing on the Motions was held, (Doc. 114), and the parties were allowed to file supplemental briefing. (Docs. 124, 125, 129, 130).

## III.   DISCUSSION

### a. Norman's Motion

Norman challenges whether the warrant to search the Oakley Address, which was also used to search the vehicle inside the garage at the house, was supported by probable cause, asserting that the affidavit in support of the warrant was "barebones" and, therefore, no reasonable law enforcement officer could rely on it in good faith. The United States responds that the warrant was supported by probable cause and/or the good faith exception applies, and, alternatively, the search of Norman's vehicle was justified by the automobile exception to the warrant requirement. The Court will address each issue in turn.

### i. The warrant

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When evidence is improperly obtained in violation of the Fourth Amendment, that evidence, as well as the fruits derived therefrom, may be excluded from use at trial.

*See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion, as is evidence later discovered and found to be derivative of any illegality or fruit of the poisonous tree." (cleaned up)). As has been recognized, however, the Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands," and so the exclusionary rule is a "judicially created remedy." *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The Supreme Court has held that the purpose of exclusion is limited to "deter[ring] police misconduct." *See Leon*, 468 U.S. at 916. By this logic, when evidence is obtained pursuant to a search warrant, exclusion does not serve this narrow goal. *See id.* at 913–14. Therefore, courts are directed to not suppress evidence "when law enforcement obtained it in good-faith reliance on a warrant." *United States v. Morton*, 46 F.4th 331, 335 (5th Cir. 2022) (citing *Leon*, 468 U.S. at 897).[2]

"Reliance on a warrant is unreasonable," and therefore not in good faith, when "the warrant is based on an affidavit so lacking in probable cause as to render belief

---

[2] A different vision of the Fourth Amendment's power to protect existed prior to its "crabbed" reading by the Supreme Court in *Leon*. *Leon*, 468 U.S. at 935 (Brennan, J., dissenting). That earlier, more expansive—and in this Court's opinion, faithful—approach recognized "that seizures are generally executed for the purpose of bringing proof to the aid of the Government, that the utility of such evidence in a criminal prosecution arises ultimately in the context of the courts, and that the courts therefore cannot be absolved of responsibility for the means by which evidence is obtained." *Id.* at 937 (citations and quotations omitted). Before the narrowing of the exclusionary rule, a process that did not culminate in *Leon*'s good-faith exception but reached an apogee there, "the Court plainly understood that the exclusion of illegally obtained evidence was compelled not by judicially fashioned remedial purposes, but rather by a direct constitutional command." *Id.* at 939.

in its existence unreasonable." *Id.* at 336 (first citing *Leon,* 468 U.S. at 923; and then citing *United States v. Triplett,* 684 F.3d 500, 504 (5th Cir. 2012)). Such "'[b]are bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *Id.* (quoting *United States v. Satterwhite,* 980 F.2d 317, 321 (5th Cir. 1992)) (internal quotation marks omitted).

When a warrant to search a suspect's residence depends upon criminal activity that did not necessarily occur at the suspect's residence, "[f]acts in the affidavit must establish a nexus between the house to be searched and the evidence sought." *United States v. Payne,* 341 F.3d 393, 400 (5th Cir. 2003) (citing *United States v. Freeman,* 685 F.2d 942, 949 (5th Cir. 1982)). "The nexus may be established through direct observation or through 'normal inferences as to where the articles sought would be located.'" *Id.* (quoting *Freeman,* 685 F.2d at 949). The critical question is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Brown,* 567 F. App'x 272, 281 (5th Cir. 2014) (quoting *Leon,* 468 U.S. at 922 n.23).

Here, the affidavit in support of the warrant to search the Oakley Address fails the baseline good-faith test. Through thirteen paragraphs, the affidavit meticulously establishes probable cause to search Norman's residence—the Hwy. 16 Address. The affidavit begins with information received from CIs about a man supplying methamphetamine to a known drug dealer in Livingston Parish. (Doc. 83-2 at 3). The source of supply, affiant Agent Scroggins learned, "resides at" the Hwy. 16 Address.

(*Id.*). One CI "observed a large quantity of methamphetamine there." (*Id.*). Through investigation, Agent Scroggins further learned that the source of supply was Defendant Norman, who had a criminal history and was on parole with the Louisiana Probation and Parole Office, where his address was listed as the Hwy. 16 Address. (*Id.*).

As the investigation into Norman developed, new information emerged. In late December 2021, an Investigator with Homeland Security contacted Agent Scroggins about a seized package containing twenty pounds of suspected methamphetamine that was addressed to a made-up name at 25573 Hwy 16 Apt B, next door to the Hwy. 16 Address. (*Id.*). In the affidavit, Agent Scroggins noted that this misdirection was a common tactic for drug shipments. (*Id.*).

The Livingston Parish Sheriff's Agents began surveillance of Norman. On January 7, 2022, Norman met with Wallace in the parking lot of the Hwy. 16 Address. (*Id.*). On January 10, after meeting at the same place, Wallace exited Norman's vehicle with a small package. (*Id.* at 4). After this interaction, Agents followed Norman, who drove to the Oakley Address and spent the night. (*Id.*). This is the first and only mention of the Oakley Address until the final substantive paragraph of the affidavit.

Agents also followed Wallace, who was arrested with three ounces of methamphetamine and told Agents that he had purchased the drugs at the Hwy. 16 Address. (*Id.*). Agents obtained a warrant to search Wallace's cell phone and found "numerous text messages" with a phone number registered to Norman at Hwy. 16 Address. (*Id.*). In these messages, Wallace and Norman arranged to meet Norman "at

his apartment, his residence, and nearby locations." (*Id.*).

The next day, January 11, Agents continued surveillance of Norman, who drove between the Oakley Address and the Hwy. 16 Address twice that morning. (*Id.* at 5). Agents also observed a silver Nissan Altima at the Oakley Address, which was driven there by a "known associate" of Norman's whose listed residence was the Hwy. 16 Address. (*Id.* at 5). Finally, the affidavit, which was submitted on January 12, reports that Agents continued surveillance of Norman "as he travel[ed] between the apartments, the residence, and to other nearby locations." (*Id.*). Based on the foregoing information, Agent Scroggins sought a warrant to search the Oakley Address, and the warrant was used to justify the search of Norman's vehicle at the address.

The affidavit fails to allege sufficient facts to establish a nexus between the Oakley Address and the evidence of drug dealing sought by the Agents. *See Payne*, 341 F.3d at 400. The affidavit does not establish sufficiently that the Oakley Address is Norman's residence, and it does not give rise to a reasonable inference that evidence of drug dealing would be found at the Oakley Address. Crucially, the affidavit also fails to provide generalized inferences based on Agent Scroggins' experience that might connect the scant mentions of the Oakley Address to the drug dealing activities observed at the Hwy. 16 Address. Instead, the affidavit offers nothing more than three observations of Norman at the Oakley Address and the conclusory statement that the Oakley Address is "believed to be" Norman's residence. (Doc. 83-2 at 5). No reasonable officer could rely in good faith on such a paltry

connection between observed drug dealing and a separate location. Indeed, the primary inference derivable from the affidavit is that all of the drug dealing instead occurred at the Hwy. 16 Address. That is where Norman met Wallace multiple times, that is where Agents observed a suspected drug deal, that is where Wallace reported buying drugs, that is where the shipment of methamphetamine was addressed to, that was Norman's listed address, that was where Norman's phone was registered to, and that is where associates of Norman also likely lived with him.

The U.S. Court of Appeals for the Fifth Circuit's per curiam decision in *United States v. Bell*, 832 F. App'x 298 (5th Cir. 2020), is instructive here. In that opinion overturning a district court's suppression of a residential search warrant, the Fifth Circuit found that the affidavit in support of the warrant established a sufficient nexus between Bell's drug dealing and a residence. *Id.* at 298. There, Bell had sold drugs to an undercover officer three times, and the two different cars Bell drove for those sales were later seen at the residence. *Id.* at 301. The residence was listed as Bell's last known address, and Bell went straight from the residence to a drug sale. *Id.* Significantly, the affidavit also "coupled" these observed investigative facts with "inferences, drawn from [the affiant's] training and experience, that individuals involved in the drug trade often keep contraband in their residences." *Id.*

In *United States v. Aguirre*, 664 F.3d 606, 611 (5th Cir. 2011), the Fifth Circuit upheld a lower court's finding of probable cause to enter a house under circumstances similar to those in *Bell*. Before entering the house in *Aguirre*, law enforcement had just seized several ounces of drugs from another resident of the house who had only

just left. 664 F.3d at 611. Based on this information, and the Agents' stated reliance on their "training and experience" to "[know] that drug dealers often [kept] assets and drug paraphernalia at their residences," the Government argued that probable cause existed to enter the house. *Id.* The Fifth Circuit agreed, finding that "[t]ogether," the specific observations and the general inferences "established a nexus between" the residence and the "illegal drug-related activities." (*Id.*). In fact, the Fifth Circuit has consistently found that "such a *combination* of observations connecting a defendant's drug trafficking to a particular location *and* inferences regarding the tendencies of drug traffickers to keep contraband in their residences makes an affidavit more than 'bare bones.'" *Bell*, 832 F. App'x at 302 (emphasis added) (citing *United States v. Fields*, 380 F. Ap'x 400, 403–04 (5th Cir. 2010) (per curiam); *see United States v. Gildon*, 340 F. App'x 956, 957 (5th Cir. 2009) (per curiam); *United States v. Kleinebreil*, 966 F.2d 945, 949 (5th Cir. 1992)).

Here, the affidavit submitted by Agent Scroggins lists some observations by law enforcement of a suspected drug dealer going to a second address. Absent is an explicit statement that based on these observations, the Agents concluded that the second address was Norman's residence. Also absent is any general inference—of the type that saved affidavits in numerous similar circumstances—about the tendencies of drug dealers to use second residences for storing drugs or generally to keep contraband in their residences. Far from being talismanic utterances that bestow probable cause on run-of-the-mill investigative observations, such general inferences are crucial to connecting illegal activity to a particular place to be searched, a

connection required by the Fourth Amendment. *See Gates*, 462 U.S. at 238. The affidavit here merely offers facts supporting a fair conclusion that Norman might be found at the Oakley Address on any given day. But it is this information *combined* with general inferences—which draw on extensive experience to say what the investigative observations *mean*—that creates a nexus between a residence and evidence sought in a warrant.

Instead, the affidavit here performs a sleight of hand with probable cause, accumulating facts one might assume lead to a request to search the Hwy. 16 Address, and then abruptly switching in the final words to ask for a search warrant for the Oakley Address. As the affidavit stands, it was insufficient to allow for the Agents who executed it to rely on it in good faith. *See United States v. Brown*, 567 F. App'x 272, 283 (5th Cir. 2014) ("Probable cause must be established in the affidavit and evidence presented to the magistrate. . ..").

Finding that the good-faith exception does not apply, the Court now turns to the second step of the test: "whether the warrant was supported by probable cause." *Rojas Alvarez*, 451 F.3d at 329–30 (quoting *Gibbs*, 421 F.3d at 355). "Probable cause must be established in the affidavit and evidence presented to the magistrate; an 'otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate.'" *Brown*, 567 F. App'x at 283 (quoting *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971)). Relevant here, probable cause means there must be "a fair probability that contraband or evidence of a crime will

be found in a particular place." *Gates*, 462 U.S. at 238. While the affidavit in this case certainly alleged sufficient facts to create a nexus between the Hwy. 16 Address and evidence of drug dealing, it failed to allege sufficient facts to "provide the magistrate with the substantial basis . . . to conclude that there was probable cause" to search the Oakley Address. *See Brown*, 567 F. App'x at 283–84. For this reason, the warrant fails.

### b. The automobile exception

In an effort to save its evidence against Norman, the United States argues in the alternative that the automobile exception applies to allow the search of Norman's vehicle, which was parked inside of the garage at the Oakley Address. (*See* Doc. 125 at 18–23). According to the United States, after observing the interaction between Norman and Dejoie on January 13, 2022, probable cause existed to believe a narcotics transaction had occurred and, therefore, probable cause also existed to search Norman's vehicle under the automobile exception to the warrant requirement. *See, e.g.*, *United States v. Buchner*, 7 F.3d 1149, 1154 (5th Cir. 1993) ("However, under the automobile exception police may conduct a warrantless search of an automobile and any containers therein if they have probable cause to believe that it contains contraband or evidence of crime."). Officer Evitt, who was asked to pull Norman over by Agents who observed the suspected narcotics transaction, arrived at the Oakley Address immediately after Norman had driven into the garage. (Tr. at 47). Norman was arrested and his vehicle was searched while inside the garage. Despite this, the United States argues the automobile exception should continue to apply to Norman's

vehicle while the vehicle was located within his home, an area typically accorded strong Fourth Amendment protections. *See Payton v. New York*, 445 U.S. 573, 587–590.

In support, the Government points to an 85-year-old case in which the Supreme Court upheld the actions of an officer who searched a vehicle after it pulled into a garage and after the driver of the vehicle acknowledged the vehicle contained contraband. (Doc. 125 at 22–23 (citing *Scher v. United States*, 305 U.S. 251 (1938))). The Government correctly also calls the Court's attention to the far more recent *Collins v. Virginia*, 584 U.S. 586, 598 (2018), which unequivocally declined to extend "the automobile exception to permit a warrantless intrusion on a home or its curtilage,"[3] but nonetheless urges the Court to ignore *Collins*' command in favor of *Scher*'s.

The Court will not follow *Scher*, which *Collins* criticized as "case specific and imprecise" and explicitly cabined as factbound, *id.* at 599, because *Scher*'s facts do not "directly mirror" those of this case, as the Government claims, (Doc. 125 at 23). In *Scher*, as already noted, the driver admitted prior to the search that the vehicle contained contraband, and the Court there emphasized that "[e]xamination of the automobile accompanied an arrest, without objection *and upon admission of probable*

---

[3] Curtilage, which is "the area immediately surrounding and associated with the home," is considered "part of the home itself for Fourth Amendment purposes." *Collins v. Virginia*, 584 U.S. 586, 592 (2018). If the garage at the Oakley Address, which was attached to the residence, is not simply part of the home itself for Fourth Amendment purposes, it is at least curtilage, which is afforded the same protections as the home under the Fourth Amendment. *See id.* at 600.

*guilt.*" *Scher*, 305 U.S. at 255 (emphasis added). Here, in contrast, the search of Norman's vehicle was prompted by no admission of guilt. Instead, Norman's vehicle was searched while it was inside a garage pursuant to an invalid search warrant, in violation of the Fourth Amendment. For these reasons, the automobile exception does not apply to the warrantless search of Norman's vehicle while it was inside his garage. *See Collins*, 584 U.S. at 598.

In sum, neither the search warrant nor the automobile exception can justify the search of Norman's vehicle and house, and Norman's Motion to Suppress will be granted.

### i.    Dejoie's Motion

The Court now turns to Defendant Dejoie's Motion, which seeks to suppress the search of his truck in the parking lot of a Walmart and statements made to law enforcement following his arrest. On January 13, Agent Scroggins observed a suspected drug transaction between Dejoie and Norman, during which Dejoie gave a black duffle bag to Norman in exchange for a gray Walmart bag. (Tr. at 44). After the transaction, some Agents followed Norman and others followed Dejoie, who parked at a nearby Walmart. (*Id.* at 47). While Dejoie was in the Walmart, Sergeant Childers looked into Dejoie's truck and saw the gray Walmart bag. (*Id.* at 114). Before Dejoie exited Walmart, Sergeant Childers learned over the radio that other law enforcement "had Mr. Norman in custody at his residence" and that "the black duffel bag," which Dejoie had just given to Norman, "contained a large amount of suspected

methamphetamine." (Tr. at 116).[4] This information provided Sergeant Childers with probable cause to arrest Dejoie and seek a search warrant for the vehicle.[5] *See, e.g., United States v. Huerra*, 884 F.3d 511, 517 (5th Cir. 2018) (Probable cause exists if "there is a fair probability that contraband or evidence of a crime will be found in a particular place"); *Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause, we have often told litigants, is not a high a bar"); *See United States v Wadley*, 59 F.3d 510, 512 (5th Cir. 1995) ("Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense."). As such, the affidavit submitted in support of the search warrant to search Dejoie's truck—which described the events leading up to Dejoie's arrest *including* that the duffle bag Dejoie gave Norman contained suspected methamphetamine—was also supported by probable cause.

---

[4] Although the evidence in the black duffel bag is inadmissible against Norman, whose Fourth Amendment rights were violated by the agents who found the bag, the duffel bag is admissible against Dejoie, who has no standing to challenge its admission. "Fourth Amendment rights are personal rights," and "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing." *Alderman v. United States,* 394 U.S. 165, 171–72, 174 (1969). In other words, the search of the duffle bag "invaded no right of privacy of" Dejoie's that "would entitle" Dejoie "to object to its use at his trial." *Wong Sun v. United States*, 371 U.S. 471, 492 (1963).

[5] The Court writes further to note that during the hearing on Defendants' Motions, the Government's evidence regarding money allegedly visible in the gray Walmart bag was expertly called into question by defense counsel for Dejoie. Regardless, the Court here finds that probable cause existed for the arrest and search warrant based on: (1) the duffle bag, which contained methamphetamine and which Agents had observed Dejoie give to Norman; (2) the gray Walmart bag, visible inside Dejoie's truck, which Dejoie had received in exchange for the duffle bag; and (3) the cumulative law enforcement investigation and observations leading up to Dejoie's arrival at the Walmart.

17

Dejoie also seeks to suppress his post-arrest statements to Sergeant Childers, which Dejoie argues were involuntarily given. "Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of h[is] constitutional rights." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). A *Miranda* warning, which may impact whether a statement was given voluntarily, is only required when a defendant is subject to "custodial interrogation." *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc) (quoting *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)). Although Dejoie was subject to custodial interrogation here, his Fourth Amendment rights were not violated because uncontroverted evidence established that Sergeant Childers administered the *Miranda* warnings to Dejoie prior to questioning. (Tr. at 116–17). Sergeant Childers' report, (Doc. 73-2 at 19), and the affidavit in support of the search warrant of Dejoie's vehicle, (Doc. 73-3 at 5), both also reflect that a *Miranda* warning was administered. There is no evidence that the statements were coerced or that the statements were given prior to the issuance of *Miranda* warnings. For these reasons, Dejoie's alleged post-arrest statements are admissible.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant Quwinton Norman's **Motion to Suppress (Doc. 82)** be and is hereby **GRANTED**. The Court will exclude the evidence seized from 25865 Oakley Avenue, Denham Springs, Louisiana, and Norman's vehicle.

18

**IT IS FURTHER ORDERED** that Defendant Tyrone D. Dejoie Jr.'s **Motion to Suppress (Doc. 73)** be and is hereby **DENIED**.

**IT IS FURTHER ORDERED** that a telephone status conference be and is hereby **SET** for April 17, 2024, at 2:30 P.M. for the purposes of setting a date for trial and related deadlines. Dial-in instructions will be sent to counsel prior to the conference.

Baton Rouge, Louisiana, this ____8th____ day of April, 2024

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**